UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:17-cr-00360-MOC-DSC

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **LAMARCUS DEANDRAY SEABROOKS,** | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the Court on defendant's Motion to Suppress. On June 11, 2017, defendant, a passenger in a car that was parked in the middle of a public road with both the driver and defendant passed out or asleep, was arrested after a firearm was found in the front passenger area of the car. In moving to suppress, defendant contends that the seizure and search of his person violated the Fourth Amendment because officers lacked an objectively reasonable suspicion of criminal activity on his part, and because the search of his pockets was not limited to a search for weapons and took place before any formal arrest. In addition, defendant moves to suppress statements attributed to him as "fruit of the poisonous tree." An evidentiary hearing was conducted on April 30, 2018.

**FINDINGS AND CONCLUSIONS**

**I.    The "Stop"**

Chad Paxton, an Officer with Charlotte Mecklenburg Police Department, testified that at around 5:15 a.m. to 5:20 a.m., while in his patrol vehicle on the way to work, he saw a silver Mercedes Benz stopped on a public road with two wheels across the double yellow line, just before a train crossing on Old Dowd Road. Officer Paxton approached the driver's side of the vehicle.

1

There he observed the driver and the passenger, later identified as the defendant, either passed out or asleep. Rather than wake the occupants at that time, Officer Paxton called for backup for officer safety. Once backup arrived, Officer Paxton and Officer Mintz approached the vehicle and woke up the occupants.

When Officer Paxton began making attempts to awaken the driver, the driver, later identified as "R.W." appeared confused and had glassy, red eyes. Paxton observed that the driver had the smell of alcohol about his person. While Paxton did that, Officer Mintz scanned the passenger side of the vehicle and observed a black semi-automatic pistol on the seat next to the defendant. The pistol was under his right thigh, pointed toward the front of the vehicle, with the grip pointed towards the door. Mintz notified the other officers of the presence of a gun in a loud voice. Defendant at this point was beginning to wake up. The officers gave defendant and R.W. commands to get their hands up and not to move. R.W. complied, but defendant did not and appeared to be incoherent but did not make any attempt to grab the firearm. Defendant then passed out again.

The driver was first removed from the vehicle and then the defendant. Officer Paxton was able to get the driver, R.W., out of the car, and brought him to the back of the Mercedes. Officers Mintz and Wassel at this point both had their firearms drawn and pointed toward defendant, who was still seated in the passenger seat. Officer Wassel then moved to the driver's door and unsuccessfully tried to unlock all of the car doors, but did manage to lower the front passenger side window. Once Wassel had lowered the window, Officer Mintz reached through the open window and grabbed the firearm that was under defendant's right thigh. Mintz then took the black pistol to the back of the Mercedes and turned it over to Officer Paxton. Officer Wassel maintained cover on defendant, who was still seated in the passenger seat. Officer Wassel then had defendant

get out of the Mercedes. Wassel had defendant move to the rear of the Mercedes where he put handcuffs on defendant.

In the body camera footage played, Officer Wassel can be heard advising defendant that he was not under arrest but that he was being detained. Officer Wassel conducted a pat down of the outside of defendant's clothing and felt what appeared to be a small packet of pills in the pocket on the front right side of his pants. Wassel then reached into the pocket and removed a small plastic baggie of oblong pills. As also heard on the bodycam footage, Wassel stated after retrieving the baggie and asking defendant what they were that he believed the pills were a controlled substance, possibly MDMA ("Ecstasy"), rather than vitamins as defendant stated they were. The pills were later analyzed by the CMPD Crime Lab and determined to be 1.89 grams of methamphetamine.

Officer Wassel then put defendant in the rear of his patrol vehicle. Officer Wassel then ran an NCIC on defendant, which indicated defendant had a prior felony conviction punishable by more than a year imprisonment. When defendant's felon status was confirmed by CMPD's DCI, Officer Wassel then informed defendant he was under arrest for being a felon in possession. Defendant was arrested on North Carolina State charges for possession of firearm by a felon, possession of a Schedule I controlled substance and possession of marijuana.

## II. Applicable Standard

Traffic stops implicate the Fourth Amendment because they amount to seizures of the subject vehicle's occupants. Whren v. United States, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Traffic stops are akin to investigatory detentions; thus, the standard announced in Terry v. Ohio, 392 U.S. 1 (1968) for determining the legality of an investigatory detention also guides a court's determination as to the legality of a traffic stop. United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011). When presented with a motion to suppress in the context of a traffic

stop, a court must first determine whether the stop was justified at its inception, which requires that law enforcement officers possessed a reasonable suspicion that crime was afoot before detaining the suspect. Terry, 392 U.S. at 20. If so, a court next determines whether the search and any resulting seizure was reasonably related in scope to the circumstances justifying it, Terry, 392 U.S. at 20, which means that it was limited in scope and duration. Digiovanni, 650 F.3d at 507.

A police officer may conduct a brief investigatory stop of a vehicle, when the "officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S.1, 30 (1968)). "[I]n connection with such a seizure or stop, if presented with a reasonable belief that the person may be armed and presently dangerous, an officer may conduct a protective frisk." United States v. Black, 525 F.3d 359, 364 (4th Cir. 2008). In assessing whether a Terry stop was supported by reasonable, articulable suspicion, a court must consider the "totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks and citation omitted). "Thus, factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together." United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004). While an officer's "hunch" will not justify a stop, Terry, 392 U.S. at 27, courts "give due weight to common sense judgments reached by officers in light of their experience and training." Perkins, 363 F.3d at 321.

A reasonable and articulable suspicion that a traffic violation has occurred is a valid basis to conduct a traffic stop under the Fourth Amendment. United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." Id. Under North Carolina law,

4

a reasonable suspicion of impaired driving arises where an officer observes a car parked on the road with its engine running, but not moving. State v. Barnard, 362 N.C. 244 (2008).

### III. Discussion

#### A. The Stop

In this case, the evidence is clear that Officer Paxton observed a Mercedes Benz parked in the middle of the road with its engine running and lights on. After his initial approach to the car, he discovered that both the driver and the defendant were asleep. Under Barnard, such circumstances give would give rise to a reasonable, articulable suspicion of impaired driving. Even if Barnard was not applicable, it is well within the realm of reason for an officer to investigate a vehicle that is stopped or parked on a roadway obstructing traffic. South Dakota v. Opperman, 428 U.S. 364, 369 (1976) ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."). Based on a totality of the circumstances, the "stop" of the Mercedes Benz was legitimate at its inception.

#### B. The Approach of the Vehicle

As the "stop" was appropriate, the officers' actions during the stop must, thereafter, be "reasonably related in scope" to the basis for the stop. United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015). After backup arrived, officers approached the vehicle from both sides. As Officer Paxton woke up the driver, Officer Mintz saw from the passenger side a pistol either partially concealed under defendant's thigh or "laid up" next to it. The court observed from the pictures of the bucket car seat at the hearing that the weapon had to have been scrunched-up between the seat and defendant's leg. Officer Paxton then had the driver step out of the vehicle, and Officer Paxton testified that the driver stumbled and he smelled the odor of alcohol on the

driver. During a traffic stop, officers may require a driver to exit a vehicle based on the suspicion justifying the traffic stop itself. Maryland v. Wilson, 519 U.S. 408, 415 (1997).

**C.     Seizure of the Weapon**

Seizing the weapon after removal of the driver was appropriate as the seizure was reasonably related in scope to the basis for the stop. Officer Mintz testified that the gun was not fully concealed as he could observe it from the exterior passenger side of the vehicle. Where a gun is observed in plain view, and is partially concealed, the seizure of the gun is proper "because part of the gun was concealed, making its incriminating character apparent." United States v. Spratley, 138 Fed. App'x. 571, 572 (4th Cir. 2005) (*per curiam*). In United States v. Davis, 428 Fed. App'x. 255, 256 (4th Cir. 2011), the Court of Appeals for the Fourth Circuit held:

> Because the officers were performing a lawful traffic stop when one of them observed the grip of a firearm protruding from underneath the driver's side floor mat as the officer looked into the vehicle, the weapon was within reaching distance of a front seat passenger, and the firearm's incriminating character as a concealed weapon was immediately present . . . we hold that the plain view doctrine applies. Consequently, the officers were authorized to seize the firearm without a warrant.

Id. at 256. Here, the court determines that the weapon was partially concealed. Thus, seizure of the weapon during the investigation of the traffic stop was appropriate even if the circumstances did not, in the officer's view, fully support bringing a charge of carrying a concealed weapon under North Carolina law. See N.C.G.S.A. § 14-269. Indeed, where officers properly initiate a traffic stop, as here, it is entirely appropriate for those officers to take control of any firearms within the passenger area of the vehicle – including those in plain view and those either partially or fully concealed – for officer and occupant safety. The fact that the officers did not discover defendant was a felon until they ran his name for prior criminal history several minutes later is of no moment. Temporarily detaining defendant to conduct that further investigation was proper. See Terry, 392 U.S. at 30.

### D. The Detention of Defendant and Pat Down

Next, the court turns to defendant's argument that the methamphetamine (which has resulted in the Section 844 charge) found in a plastic baggy inside his front pocket should be suppressed. The evidence presented at the hearing shows that the methamphetamine was discovered during the pat down of defendant, which occurred after he was discovered to be in possession of the partially concealed firearm, during a Terry frisk for weapons, but before his arrest on charges of being a felon-in-possession of a firearm.

During a traffic stop, officers may require a vehicle's driver to exit a vehicle based on the suspicion justifying the traffic stop itself. Maryland v. Wilson, 519 U.S. 408, 415 (1997). In addition, an officer making a traffic stop may order passengers to get out of the car pending completion of the stop. Id. A brief pat down is permitted "when the officer perceive[s] an appropriate level of suspicion of criminal activity and apprehension of danger." United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998). An officer may conduct a protective frisk the driver or passenger if he or she "harbor[s] reasonable suspicion that the person subjected to the frisk is armed and dangerous." Arizona v. Johnson, 555 U.S. 323, 326 (2009). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27. "The reasonable suspicion standard is an objective one, and the officer's subjective state of mind is not considered." United States v. George, 732 F.3d 296, 299 (4th Cir. 2013) (citing United States v. Powell, 666 F.3d 180, 186 (4th Cir. 2011)). Importantly, the Fourth Amendment does not "require . . . police officers [to] take unnecessary risks in the performance of their duties." Terry, 392 U.S. at 23.

The danger justifying a protective frisk arises from the combination of a forced police encounter and the possible presence of a weapon. See Adams v. Williams, 407 U.S. 143, 146 (1972); Michigan v. Long, 463 U.S. 1032, 1052 n.16 (1983). Here, a reasonably prudent person would have removed defendant from the car and conducted a protective frisk of his person in these circumstances. United States v. Sprinkle, 106 F.3d 613, 618 (4th Cir. 1997). Where, as here, an officer is confronted with an impaired passenger who was found to be in possession of a partially concealed hand gun, a prudent officer would remove that passenger from the car and frisk the passenger for other weapons. Thus, the frisk of defendant for weapons was appropriate.

### E. The Discovery of the Baggie of Pills

The next issue here is whether, in conducting the frisk for weapons, the officers properly removed the cigarette pack from defendant's pants pocket and a baggie containing pills from his change or watch pocket. While the officer who discovered the methamphetamine pills testified that he believed the pills were contraband based on his training and experience, and growing up in a medical family, this court has concerns that the frisk evolved into a warrantless search. Indeed, the officer testified that he removed the cigarette pack because, based on his training and experience, cigarette packs were used to hide controlled substances. While that may well be so, such a justification for removing an item from a detainee's pants pocket appears to fall perilously close to a search for contraband rather than a frisk for weapons. Likewise, the discovery of the baggie of "pills" is just as susceptible to innocent explanation as it is to an illegal one, as this court demonstrated during the hearing by pulling out its own over-the-counter supplement pill from its pants pocket. Indeed, in the body cam footage, an officer can be heard asking defendant *what* the pills were after they were pulled from his pants, not *whether* they were controlled substances.

In arguing that removing the baggie during the frisk for weapons was appropriate, the government has relied on the "plain feel" doctrine announced in Minnesota v. Dickerson, 508 U.S. 366 (1993). The plain feel doctrine provides, as follows:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

Id. at 375-76. Here, the relevant testimony was that the feel of the object was consistent with that of "pills." The court accepts that testimony as true, but the officer's conclusion that the items were contraband "pills" is not readily apparent from the limited pat down of the exterior of clothing allowed under Terry. While the government relies on the plain feel doctrine announced in Dickerson as the basis for removing the baggie from defendant's pocket, it must be remembered that while establishing the plain feel doctrine, the Dickerson Court affirmed the lower court's conclusion that the discovery of crack cocaine in that case was unlawful:

> Although the officer was lawfully in a position to feel the lump in respondent's pocket, because Terry entitled him to place his hands upon respondent's jacket, the court below determined that the incriminating character of the object was not immediately apparent to him. Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by Terry or by any other exception to the warrant requirement. Because this further search of respondent's pocket was constitutionally invalid, the seizure of the cocaine that followed is likewise unconstitutional.

Dickerson, 508 U.S. at 379. Put another way, it is unclear in this case just how even an experienced officer – even one who comes from a medical family and has experience as an EMT -- can distinguish between a pill that is lawful from one that is unlawful based on the limited pat down allowed by Terry compared to the one disapproved of in Dickerson.[1] While there certainly will be

---

[1] In Dickerson, the "officer determined that the lump was contraband only after 'squeezing, sliding and otherwise manipulating the contents of the defendant's pocket'—a pocket which the officer already knew contained no weapon." Dickerson, 508 U.S. at 378 (citing to the state appellate court determination below).

9

cases where a pat down that results in the discovery of controlled substances will be covered by the plain feel doctrine, see United States v. Borne, 239 F. App'x 185, 187 (6th Cir.2007) (officer properly performed pat down search for weapons of suspected drug trafficker after traffic stop and permissibly found methamphetamine rock under "plain feel" doctrine), those cases appear to involve frisk for weapons in conjunction with a reasonable, articulable suspicion that a controlled substances offense is afoot. Thus, the Court cannot find that the further search of defendant's pants pocket complied with Terry or is covered by the plain feel doctrine.

### F. Inevitable Discovery

Finally, the Court has considered whether the methamphetamine, while inadmissible under Terry, would be admissible under the inevitable discovery doctrine. Evidence is admissible if it can be shown by a preponderance of the evidence that it ultimately or inevitably would have been discovered by lawful means. Nix v. Williams, 467 U.S. 431, 444 (1984). This exception to the exclusionary rule provides that "when … the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." Id. at 448.

The government's burden is to show by a preponderance of the evidence that the evidence otherwise subject to suppression would have been discovered inevitably by lawful means. United States v. Martinez-Gallegos, 807 F.2d 868, 870 (9th Cir. 1987). In this case, the government has shown that before the questioned search, defendant was found to be in possession of a firearm that was partially concealed in the passenger area of a motor vehicle being operating on a public road. They also showed by a preponderance of the evidence that defendant was detained while another officer called in defendant's name to DCI to determine if defendant could lawfully possess a firearm. Clearly, both the call to DCI and the arrest for possession of a firearm by a convicted

felon were unconnected to the discovery of the pills and were in close temporal proximity to defendant's detention after the discovery of the firearm within his immediate control. Further, the evidence presented clearly indicated that a search incident to arrest on the gun offense would have resulted in the discovery of the pills as the officers inventoried the contents of his pockets.

Arresting officers frequently if not routinely perform inventory searches when they arrest suspects. United States v. Hairston, 409 Fed. Appx. 668, 670 (4th Cir. Jan. 27, 2011) (citing Illinois v. Lafayette, 462 U.S. 640, 648 (1983) (holding admissible evidence recovered during an inventory search of a shoulder bag possessed by a lawfully arrested person)). Inventory searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." Colorado v. Bertine, 479 U.S. 367, 372 (1987). Clearly, the contents of defendant's pants pockets would have been searched incident to his arrest and inventoried, leading to the discovery of the methamphetamine. Because the substance seized would have been inevitably discovered, the Court will not exclude their introduction at trial.

A similar analysis applies to any incriminating statements made after the discovery of the pills and those statements, if any, will not be suppressed as the Supreme Court has held, "[a] confession cannot be 'fruit of the poisonous tree' if the tree itself is not poisonous." Colorado v. Spring, 479 U.S. 564, 571–72 (1987).

## ORDER

**IT IS, THEREFORE, ORDERED** that defendant's Motion to Suppress (#23) is **DENIED**.

Signed: April 30, 2018

Max O. Cogburn Jr.
United States District Judge